J-A01038-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| JAWAYNE K. BROWN | |
| Appellee | No. 3014 EDA 2014 |

Appeal from the Order Entered October 9, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0102174-2005,
CP-51-CR-0609071-2006

*****

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| RICHARD BROWN | |
| Appellee | No. 3046 EDA 2014 |

Appeal from the Order Entered October 9, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0102173-2005

*****

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| AQUIL BOND | |
| Appellee | No. 3054 EDA 2014 |

Appeal from the Order Entered October 9, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0102171-2005

BEFORE:  LAZARUS, J., OTT, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED JUNE 06, 2016**

The Commonwealth of Pennsylvania appeals from the order of the Court of Common Pleas of Philadelphia County that granted the motions to bar retrial filed by Jawayne K. Brown, Richard Brown and Aquil Bond (collectively, "Appellees").  After careful review, we affirm.

The underlying facts of this case have been previously set forth by this Court as follows:

> At approximately 4:20 a.m. on the morning of November 21, 2002, Rohan Haughton ("Haughton") called his fiancée Nicole Islam to tell her that Hadith Goodman ("Goodman") had asked him to take money to Chante Baker ("Baker") and drive her to the airport.  Airline records showed that Goodman had purchased tickets for himself and Baker on two flights to California, but that neither showed up or boarded a plane.  Just before midnight of the next day, the Philadelphia police found Haughton's body in a parked Chevrolet Tahoe.  He had been bound and gagged with duct tape and had died of a gunshot wound to the head.
>
> In late November 2002, police arrested Vincent Smithwick ("Smithwick") on drug charges and soon referred him to federal law enforcement authorities for prosecution on federal crimes.  Smithwick learned that another inmate, Christopher Smith, ("Smith"), intended to cooperate with Pennsylvania state authorities and offer testimony regarding Smithwick's involvement in Haughton's murder.  Smithwick thus came

---

[*] Former Justice specially assigned to the Superior Court.

forward and entered into two plea agreements, one state and one federal, pursuant to which he implicated himself in various crimes, including the murders of Haughton and another man. In return for his testimony, state and federal authorities agreed to a maximum term of incarceration for Smithwick of 20 – 40 years of concurrent time for all state and federal charges. In addition to himself, Smithwick also identified Jawayne Brown, Baker, Smith, Richard Brown and Aquil Bond ("Bond") as individuals responsible for Haughton's murder.

Baker subsequently also entered into a plea bargain agreement, pursuant to which she agreed to testify about her role in Haughton's death in exchange for the Commonwealth's agreement to drop all murder, kidnapping, and weapons offenses against her. She pled guilty to robbery and conspiracy charges, and the Commonwealth agreed not to seek the mandatory minimum five to ten years of incarceration for those crimes.

The trial of Jawayne Brown, Smith, Richard Brown, and Bond for Haughton's murder commenced on July 14, 2006, with Baker and Smithwick as the principal witnesses for the Commonwealth. Baker testified that on several prior occasions she had traveled to California with Goodman to take large amounts of cash (taped to her body) for him. According to Baker, on November 20, 2002, Goodman had advised her that they would be taking another such trip together; early the next morning, however, he came by her house to tell her that he would be taking a later flight, and that instead Haughton would bring the money to her in advance and accompany her on her flight. Baker testified that Richard Brown saw Goodman leaving her house and questioned her about his visit. Baker told him that Haughton would be arriving with a large sum of money. According to Baker, Richard Brown told her that he was surprised she had not confided in him about this operation previously, since "that is what he did, he robbed people."

Baker testified that a few hours later, in the early morning of November 21, Richard Brown brought Haughton into her house at gunpoint. She testified that with Richard Brown and Smith in attendance, Jawayne Brown and Bond beat and tortured Haughton, demanding that he give them the money that Baker was supposed to take to California for Goodman. According to Baker, Smithwick then arrived and Jawayne Brown, Smith, Bond and Smithwick took Haughton out the back door of the house.

Smithwick testified that Bond called him in the early morning hours of November 21 and told him to come to Baker's house. Upon his arrival, he saw Haughton tied up and gagged in the kitchen, being questioned about the money while Bond prodded him with a steak knife. According to Smithwick, Richard Brown then ordered Bond to put Haughton "to sleep," at which time Smithwick, along with Jawayne Brown, Bond, and Smith, forced Haughton out the back door, over a fence, and into Haughton's Chevrolet Tahoe. While Smith followed in a separate vehicle, Jawayne Brown drove the Tahoe. In the backseat of the Tahoe, Bond and Smithwick continued to attempt to force Haughton to disclose the location of the money. When Haughton failed to disclose any additional information, Smithwick testified that Bond shot him in the head. Jawayne Brown, Bond and Smithwick then abandoned the Tahoe and joined Smith in his vehicle. Smith drove them all to a hotel. Smithwick testified that Bond then gave him $5,000 for his efforts.

*Commonwealth v. Brown, J. et al.*, No. 3282 EDA 2006, unpublished memorandum at 2-5 (Pa. Super. filed February 17, 2012) (citations omitted).

Following a jury trial before the Honorable Sheila Woods-Skipper, Appellees were convicted of second-degree murder and other offenses on July 31, 2006. Following separate hearings held on different days in October 2006, the court sentenced Appellees to life imprisonment without parole plus additional sentences for other crimes.

On direct appeal, this Court reversed the judgments of sentence and granted Appellees a new trial based on prosecutorial misconduct. *See Brown*, *J.*, *supra*; *Commonwealth v. Brown, R.*, No. 3055 EDA 2006, unpublished memorandum (Pa. Super. filed February 17, 2012). This Court noted:

We . . . direct our focus herein on two specific instances of prosecutorial misconduct . . . namely the prosecutor's improper

- 4 -

attempts to bolster the credibility of a key government witness (Smithwick). These two instances of prosecutorial misconduct were highly prejudicial . . . and, when considered in the context of the atmosphere of the trial as a whole, constituted deliberate attempts to destroy the objectivity of the jury and prevent the jury from rendering a true verdict.

*Commonwealth v. Brown, J.*, *supra* at 9.

The Commonwealth sought en banc reargument, which this Court denied on April 18, 2012. The Commonwealth then filed petitions for allowance of appeal from this Court's orders, which our Supreme Court denied on September 18, 2013.

On remand, this case was assigned to the Honorable Benjamin Lerner. Appellees each filed a motion to dismiss, and argument was held on August 13, 2014. On October 9, 2014, Judge Lerner granted the motions on double jeopardy grounds.

The Commonwealth filed a timely appeal in which it raises the following issues for our review:

1. Did the lower court err in barring retrial under *Commonwealth v. Smith*[, 615 A.2d 321 (Pa. 1992)]?

2. Did the lower court err in concluding that it was required to bar retrial due to statements in this Court's prior panel opinion?

3. Did the lower court err in refusing to transfer these cases to the trial judge, where the prosecutor's intent was in issue?

4. Did the trial judge abuse her discretion in finding that the Commonwealth did not unavoidably prejudice the jury, where the Commonwealth fairly responded to defense arguments that the prosecution irresponsibly made a "knee jerk" plea deal with a witness?

Appellant's Brief, at 4.

Because this Court's memorandum in support of reversing the judgment of sentence and granting a new trial is inextricably linked to the matter before us, we cite significant portions therefrom.

After discussing the prohibition against improper bolstering or vouching for a government witness, this Court noted:

> In the present case, during Smithwick's testimony (both direct and cross-examinations) the terms of the written plea agreement with the Commonwealth were described and discussed at length. After Smithwick concluded his testimony, counsel for the Commonwealth then advised the Court that it intended to call as its next witness Edward McCann ("McCann"), an Assistant District Attorney and chief of the homicide unit of the Philadelphia District Attorney's Office. McCann signed Smithwick's plea bargain agreement on behalf of the Commonwealth. Because McCann had not been on the Commonwealth's witness list, defense counsel . . . objected and demanded an offer of proof, at which time counsel for the Commonwealth provided the following:
>
> > MR. CAMERON: Sure. He is simply going to say, as counsel well knows, that in conjunction with [the federal prosecutor] he spoke to [Smithwick]. Thereafter a plea agreement was drafted. Thereafter a written statement was given. Thereafter pursuant to the agreement he was arrested on third-degree murder. Thereafter he pled guilty to those charges. Thereafter he's filling his agreement under the agreement. And that's it.
>
> In response, defense counsel . . . renewed their objections on the grounds that the information contained in this offer of proof had already been provided to the jury during Smithwick's testimony – and that the actual purpose of McCann's testimony was to bolster Smithwick's credibility. Counsel for the Commonwealth *then twice represented to the court that there would be no attempts to bolster Smithwick's credibility*:
>
> > [COUNSEL FOR BOND]: Yeah. I object to Mr. McCann saying anything about the [plea bargain] agreement. The agreement is in black and white. The agreement is what it is. What counsel is trying to do now is bolster the

- 6 -

credibility of the witness saying, Oh, yeah, I heard his story. I believe him.

[PROSECUTOR]: **He is not going to say that.**

[COUNSEL FOR BOND] But that is the implication, Judge. The agreement is in black and white. It was explained to you by Mr. Smithwick. There is nothing Mr. McCann can add in addition to what has been already testified to. The only reason he is putting Mr. McCann on is to somehow give this an aura of credibility that I would object to.

[PROSECUTOR] **He is not going to say anything about credibility.**

Based upon these representations, the trial court allowed McCann to testify.

On the stand, after asking McCann relatively perfunctory questions about the terms of the plea bargain with Smithwick, counsel for the Commonwealth then asked a series of questions in direct contradiction to his prior representations to the trial court regarding the credibility of Smithwick:

Q: And the various things – and you've spoken with him, correct?

A: I have spoken to him on more than one occasion, yes.

Q: **And has [sic] been corroborated in the things that he told you?**

[COUNSEL FOR JAWAYNE BROWN]: Objection.

THE COURT: Sustained.

BY THE PROSECUTOR:

Q: **Do you make these kinds of deals out of the blue without corroboration?**

[COUNSEL FOR JAWAYNE BROWN]: Objection.

THE COURT: Sustained.

[COUNSEL FOR SMITH]: We have a motion, Your Honor.

THE COURT:     Overruled for now.  Go ahead.

BY THE PROSECUTOR:

Q:     **Is this a common practice for you as chief of the homicide unit to make these kind of deals?**

[COUNSEL FOR JAWAYNE BROWN]     Objection.

[COUNSEL FOR SMITH]     Objection.

THE COURT:     Sustained.

[PROSECUTOR]   I'll handle it in my argument.

[COUNSEL FOR SMITH]     Objection to comments.

THE COURT:     That is sustained as well.  That is striken.

The trial court then denied a motion for mistrial for prosecutorial misconduct asserted by defense counsel.

**Commonwealth v. Brown, J.**, **supra** at 13-16 (citations omitted, emphasis in original).

With respect to this exchange, this Court noted:

This questioning regarding corroboration constituted plainly improper and willful attempts by the prosecutor to bolster Smithwick's credibility, despite his unambiguous representations to the trial court (in response to objections by defense counsel on this issue) in advance of McCann's testimony to the contrary. As in [**Commonwealth v.**] **Reed**, [446 A.2d 311 (Pa. Super. 1982)], the prosecutor's inflammatory questions here insinuated the existence of facts in the prosecutor's personal knowledge but not a part of the trial record (i.e., the results of a prior undisclosed investigation into Smithwick's credibility).  The prosecutor's clear intention here was to leave the jury with the strong impression that Smithwick, as a result of a prior investigation by McCann and/or the District Attorney's Office, had the support of prosecuting authorities as a credible witness. There is no other reasonable inference to be drawn.

That the trial court sustained the objections to the questions and thus precluded McCann from answering them is irrelevant. Improper questioning may form the basis of a claim of

- 8 -

prosecutorial misconduct, even where objections are sustained and thus the questions go unanswered. In **Commonwealth v. Hoskins**, 403 A.2d 521 (Pa. 1979), for instance, our Supreme Court granted a new trial because the prosecutor asked a question during cross-examination of the defendant implying that an important defense witness was involved in drug trafficking and the Muslim religion, even though these issues were not relevant to the case. **Id.** at 528. Although the objection to the question was sustained, our Supreme Court ruled that the trial court erred in not granting a mistrial, noting that "[s]uch inferences are clearly improper and inflammatory." **Id.** Likewise, in **Commonwealth v. Percell**, 454 A.2d 542 (Pa. 1982), our Supreme Court reached a similar decision when the prosecutor asked a defense witness several questions about witness tampering charges in an unrelated case, even though the trial court had ruled this evidence inadmissible.

. . .

Not every instance of prosecutorial misconduct mandates the granting of a new trial. **Commonwealth v. Montalvo**, 986 A.2d 84, 108 (Pa. 2009) *cert. denied*, 131 S.Ct. 127 (2010) (quoting **Commonwealth v. Cooper**, 941 A.2d 655, 668 (Pa. 2007). Reversible error occurs when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict. **Commonwealth v. Miller**, 819 A.2d 504, 515 (Pa. 2002), *cert. denied*, 540 U.S. 827 (2003) (quoting **Commonwealth v. Simmons**, 662 A.2d 621, 638-39 (Pa. 1995), *cert. denied*, 516 U.S. 1128 (1996)).

. . . ..

In the present case, we must conclude that the prosecutor's misconduct had serious consequences in unfairly influencing the jury and thus depriving Jawayne Brown and Bond of a fair trial. In particular, the Commonwealth's case against Jawayne Brown and Bond depended heavily, and in certain respects solely, on the credibility of Smithwick's testimony. While Baker's testimony provided evidence of the events occurring in her house on the morning of July 21, 2002, she was not in the Tahoe when Haughton was killed and thus she could not testify regarding the final sequence of events that resulted in

Haughton's murder. In addition, the Commonwealth did not produce any forensic evidence placing Jawayne Brown, Bond or other co-defendants in the Tahoe, as none of the fingerprints inside matched the accused and no other trace evidence (e.g., hair follicles, body fluids) was taken from the vehicle for analysis.

In view of this evidence, Smithwick was a key witness for the Commonwealth, as his testimony provided the jury with a detailed explanation of the events taking place after Haughton was taken from Baker's house, including what happened in the Tahoe. The Commonwealth's case thus depended in substantial part on the credibility of Smithwick's testimony. When determining the extent of prejudicial effect on a jury, our Supreme Court has advised as follows:

> An accepted guide in determining prejudicial effect is that, if the remark may be said with fair assurance to have had but a slight effect upon the jury, if any at all, and one is not left in doubt that it had no substantial influence in the case, it will not vitiate the otherwise fair trial.

*Commonwealth v. Davis*, 440 A.2d 1185, 1188 (Pa. 1981) (quoting *Commonwealth v. Phillips*, 132 A.2d 733, 736 (Pa. Super. 1957)). Given the importance of Smithwick's credibility to the Commonwealth's case, the prosecutor's improper bolstering – by implying to the jury that an investigation by McCann (or other members of the Philadelphia District Attorney's Office) had corroborated the veracity of Smithwick's testimony – was prejudicial to the rights of [Appellees] to a fair trial. Put another way, under the *Davis* standard, on the facts presented in this case, we cannot conclude that the prosecutor's conduct "had no substantial influence in the case." *Reed*, 446 A.2d at 316 (citing *Davis* 440 A.2d at 1188)).

*Commonwealth v. Brown, J.*, *supra*, at 18-22.

Accordingly, this Court found prosecutorial misconduct with respect to bolstering the credibility of a Commonwealth witness.

This Court then considered whether the Commonwealth engaged in prosecutorial misconduct during closing argument.

- 10 -

At trial it was agreed that Smithwick would only testify to the murders to which he pled guilty, namely those of Haughton and Anthony Harris. The Commonwealth kept to this agreement during trial.

> During his closing argument, however, the prosecutor referenced Smithwick's involvement in five additional murders.
>
> > [PROSECUTOR]: It's not just about this case. They tried to say what is the point of Mr. McCann. *Well, the point of Mr. McCann was he just didn't give up this case. He helped solve seven murders that there was no evidence on. Seven murders.* So I'll give him that deal in a heartbeat. Particularly in this. If we can get those kinds of guys that did what they did to Rohan Haughton, and the way they tortured him.
>
> Defense counsel then moved for a mistrial. After an extended discussion at sidebar, the trial court denied the motion for a mistrial, at which time the following exchange occurred in the presence of the jury.
>
> > THE COURT: Jurors, I am sustaining defense's objections regarding that. There is no evidence on the record that indicates that Mr. Smithwick helped to solve seven unsolved murders. My recollection is that the testimony was that he did participate in the involvement of multiple other cases. But there is no specific information regarding seven unsolved murders.
> >
> > [Prosecutor]: Multiple as opposed to seven. My apologies.
> >
> > What did he gain by –
> >
> > [Counsel for Jawayne Brown]: I would object.
> >
> > THE COURT: Let me just clarify. The evidence on the record does not indicate Mr. Smithwick's involvement in the solving of seven unsolved murders. There is no evidence that says that.
> >
> > [Prosecutor]: As I said, I'll withdraw the seven. He has helped with multiple cases was the word you heard from the judge.

- 11 -

The prosecutor's conduct here was clearly improper, for at least two reasons. First, he argued facts *dehors* the trial record. While a prosecutor may comment on the credibility of a Commonwealth witness during a closing argument, he must base his arguments on evidence presented at trial or on inferences that reasonably derive from evidence presented at trial. **Commonwealth v. Miller**, 819 A.2d 504, 516 (Pa. 2002), *cert. denied*, 540 U.S. 827; **Commonwealth v. Robinson**, 864 A.2d 460, 526 (Pa. 2004) (citing **Commonwealth v. Miles**, 681 A.2d 1295, 1301 (Pa. 1996), *cert. denied*, 520 U.S. 1187 (1997)). In this case, the only evidence in the record regarding Smithwick playing any role in connection with cases other than the murders of Haughton and Anthony Harris was from ADA McCann, who testified that arrests were made in other cases as a result of information provided by Smithwick, and from Smithwick and Detective Bamberski, both of whom testified generally that the statement Smithwick provided subsequent to the signing of the plea agreement covered matters other than the Haughton murder. No evidence was presented at trial that (1) information provided by Smithwick had *solved* any murder case, and/or (2) that Smithwick had provided information in exactly seven cases (or in any other *murder* cases). The lack of evidence in this regard was largely the result of the trial court's ruling (described above) precluding Smithwick from testifying about any cases other than the murders of Haughton and Anthony Harris – and for this reason should have been well known to the prosecutor.

Second, the prosecutor's assertion that the information provided by Smithwick helped to *solve* seven other murder cases constituted an obvious effort by the prosecutor to bolster Smithwick's credibility. From the prosecutor's reference to "solving murder cases," the jury could have reasonably inferred that the information provided by Smithwick had led not just to arrests, but also successful prosecutions resulting in convictions. Such an inference provides a strong implication that Smithwick's testimony in murder cases is accurate and truthful, and that prior juries must have found him to be credible and believable. The record in this case, however, contains no evidence regarding the outcomes of any of Smithwick's testimony in other cases (including whether or not anyone had been convicted based on his testimony). As a result, the prosecutor's representation to the jury in this case that Smithwick helped to *solve* other murder cases constituted an effort to bolster Smithwick's credibility without any basis in the record for doing so.

***Commonwealth v. Brown, J.***, ***supra***, at 23-27.

The Commonwealth's first issue on appeal is whether the trial court erred by barring retrial under ***Commonwealth v. Smith***, 615 A.2d 321 (Pa. 1992). In ***Smith***, the defendant was found guilty of three counts of first-degree murder and was sentenced to death. On direct appeal, the Supreme Court ordered a new trial due to the admission of impermissible hearsay by associates of an alleged co-conspirator. Before retrial, Smith filed a motion to preclude a new trial based on double jeopardy because he discovered that the prosecution's chief witness, who denied the existence of an agreement in exchange for his testimony, did indeed receive favorable treatment from the Commonwealth at sentencing. Smith also learned that the Commonwealth intentionally failed to disclose evidence material to the defense's case. The trial court denied relief, and this Court affirmed on direct appeal. Our Supreme Court granted allowance of appeal, and reversed. The Court explained:

> Such misconduct, standing alone, would suffice to implicate the protection of the double jeopardy clause. But further examination of the record established the bad faith of the prosecution beyond any possibility of doubt: Indeed, it would be hard to imagine more egregious prosecutorial tactics.

***Id.*** at 323. In setting forth the holding of the case, the Supreme Court stated:

> We now hold that the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial.

*Id.* at 325. Based on the **Smith** court's reference to the egregiousness of the prosecution's misconduct, the Commonwealth argues that under **Smith**, dismissal on double jeopardy grounds is only required where the Commonwealth intends to cause a mistrial or acts egregiously. The Commonwealth asserts that in the instant matter, the prosecution did not act egregiously, and, therefore the prohibition against double jeopardy is not implicated.

It is clear from the holding of **Smith** that egregiousness on the part of the prosecution is not a requirement for the bar against retrial. In **Commonwealth v. Martorano**, 741 A.2d 1221 (Pa. 1999), the Superior Court reversed both appellants' convictions for first-degree murder due to "pervasive prosecutorial misconduct, including blatantly disregarding the trial court's evidentiary rulings, disparaging the integrity of the trial court in front of the jury, and repeatedly alluding to evidence that the prosecutor knew did not exist." *Id.* at 1222.

On remand, Martorano and his co-defendant moved to dismiss based on double jeopardy. The trial court denied the motion, but on appeal, this Court reversed. The Supreme Court granted allowance of appeal and affirmed the dismissal, noting:

> While [the prosecution's] misconduct does not involve concealment of evidence as in **Smith**, it nonetheless evinces the prosecutor's intent to deprive Appellees of a fair trial; to ignore the bounds of legitimate advocacy; in short, to win a conviction by any means necessary. This is precisely the kind of prosecutorial overreaching to which double jeopardy protection applies.

- 14 -

*Martorano*, *supra* at 1223.

Viewed together, *Smith* and *Martorano* stand for the proposition that where the prosecution intentionally engages in misconduct to deprive a defendant of a fair trial, double jeopardy attaches.

The Commonwealth relies on several cases in which the appellate courts have held that prosecutorial misconduct does not bar retrial. However, these cases do not require us to reverse the trial court because they do not involve the intentional misconduct that our Supreme Court identified in *Smith* and *Martorano*.

For example, the Commonwealth cites *Commonwealth v. Burke*, 781 A.2d 1136 (Pa. 2001), where the Supreme Court held that dismissal of charges was not appropriate where the Commonwealth's failure to provide discovery materials to the defendant was not "prosecutorial misconduct" but instead "primarily involve[d] miscommunication between the police departments involved in the investigation and/or police mishandling of the evidence." *Id.* at 1145. Because there was no intentional misconduct in *Burke*, the double jeopardy concerns in *Smith* were not present.

Similarly, the Commonwealth points to *Commonwealth v. Kearns*, 70 A.3d 881 (Pa. Super. 2013), where this Court reversed the grant of double jeopardy relief based on the prosecution withholding important documents that should have been provided to defense counsel. Significantly, this Court found that although the prosecution acted in a grossly negligent manner, it did not act intentionally.

The Commonwealth's reliance on **Commonwealth v. Chmiel**, 777 A.2d 459 (Pa. Super. 2001), is also misplaced. Although this Court noted that the prosecutor engaged in misconduct, it found that "Chmiel failed to establish the higher standard of intentional prosecutorial misconduct designed to deprive Chmiel of a fair trial or to subvert the truth determining process in order for the double jeopardy clause to be implicated and retrial barred." **Id.** at 466.

Likewise, in **Commonwealth v. Moose**, 623 A.2d 831 (Pa. Super. 1993), this Court affirmed the denial of a motion for dismissal where the prosecutor committed misconduct by refusing to provide a witness' statement to the defense until the first day of trial. Nevertheless, this Court found "this was not a case where the evidence and misconduct at trial show a clear, calculated orchestration by the prosecution to deny Moose a fair trial." **Id.** at 837.

The issue before the trial court in the instant matter was not whether the actions of the Commonwealth prejudiced Appellees. That question was squarely answered in the affirmative by this Court when it reversed the judgments of sentence and remanded for a new trial. Rather, the relevant inquiry is whether the Commonwealth intentionally prejudiced Appellees to the point of denying them a fair trial. **Smith**, **supra**.

In support of its claim that the questioning of ADA McCann was not undertaken to deprive Appellees of a fair trial, the Commonwealth asserts that it was "intended to respond to Jawayne's erroneous and misleading

arguments in his opening statement that the Commonwealth gullibly believed Smithwick without independently investigating his claims." Commonwealth's Brief, at 22. At no point during the offer of proof before McCann's testimony did the Commonwealth state that it was going to ask McCann whether he had corroborated Smithwick's testimony. Nevertheless, the Commonwealth asked the following questions: "Has [Smithwick] been corroborated in the things that he told you?" N.T. 7/18/06, at 139. "Do you make these kind of deals out of the blue without corroboration?" *Id.* "Is this a common practice for you as chief of the homicide unit to make these kinds of deals?" *Id.* The court sustained objections to the three questions.

If the Commonwealth had corroborating evidence, it could have presented it to the jury. Instead, through its questioning of McCann, the Commonwealth suggested to the jury that evidence not before it corroborated Smithwick's testimony. This constituted improper bolstering. *See Commonwealth v. Reed*, 311 A.2d 314 (Pa. Super. 1982) ("vouching [occurs] when the prosecution indicates that information that is not before the jury supports the witness's testimony."). As noted by Appellee Jawayne Brown, "[b]y intentionally seeking to introduce information that had not been presented to the jury through admissible evidence, the prosecutor sought to circumvent the trial process and prejudice the Appellee in the eyes of the jury, to the point of denying him a fair trial." Brief of Jawayne Brown, at 20.

On direct appeal, this Court also granted a new trial based on the following remark during the Commonwealth's closing argument:

> [PROSECUTOR]:    It's not just about this case.    They tried to say what is the point of Mr. McCann. *Well, the point of Mr. McCann was he just didn't give up this case.  He helped solve seven murders that there was no evidence on.  Seven murders.*  So I'll give him that deal in a heartbeat.  Particularly in this.  If we can get those kinds of guys that did what they did to Rohan Haughton, and the way they tortured him.

N.T. Trial, 7/25/06, at 62.

The Commonwealth argues that this remark "failed to cause improper prejudice," Commonwealth's Brief, at 27, and that "the prosecutor's intent was to correct defense misrepresentations about the Commonwealth's case, not undermine defendants' right to a fair trial." *Id.* at 23.  The record belies these assertions.

Prior to Smithwick's testimony, the prosecutor understood that he was to limit the testimony to the two murders to which Smithwick had pled guilty.  N.T. Trial, 7/18/06, at 22-23.  Accordingly, when the prosecutor made his closing statement, he was aware that the five additional murders were outside the scope of the evidence.

Furthermore, although McCann testified that Smithwick "provided information" and "testified in other cases," *id.* at 138-39, the prosecutor argued that Smithwick "helped solve" seven murders.  On direct appeal, this Court found this statement "an obvious effort by the prosecutor to bolster Smithwick's credibility." ***Commonwealth v. Brown, J.***, ***supra*** at 26.

When the trial court first admonished the prosecutor for trying to use ADA McCann to bolster Smithwick's credibility, the prosecutor responded. "I'll handle it in my argument." N.T. Trial, 7/18/06, at 140. We agree with Judge Lerner, who noted "[the prosecutor] tried to make good on that promise despite knowing that what he was doing was improper and despite having already been warned by the trial judge about improper attempts to bolster his witness's credibility." Trial Court Opinion, 2/6/15, at 18.

The trial court properly applied the standard set forth in **_Smith_** and **_Martorano_** when it concluded that the Commonwealth's attempt to "pollute the jury with inadmissible, prejudicial statements . . . demonstrates a willingness to deny the defendants their fundamental right to have their cases decided solely on the basis of the evidence presented and the applicable law." **_Id._**

Accordingly, we conclude that the trial court did not err in finding that the Commonwealth intentionally prejudiced Appellees to the point of denying them a fair trial, thus precluding retrial under **_Smith_** and **_Martorano_**.

The Commonwealth next argues that the trial court erred in concluding that it was required to bar retrial due to statements in this Court's prior panel opinion. We disagree. The Commonwealth notes that in its Rule 1925(a) opinion, the trial court stated:

> Unfortunately, the Superior Court, on direct review of the convictions in these cases, has already determined that the prosecutorial misconduct which polluted this trial did, in fact, sink to the **_Smith_** and **_Martorano_** levels, a conclusion with which this court, after reviewing the trial court record, is compelled to agree.

- 19 -

Trial Court Opinion, 2/6/15, at 13.

We note that the trial court specifically stated that it conducted its own review of the record when determining whether the prosecutorial misconduct in this case barred retrial under **Smith** and **Martorano**. **See also** Trial Court Opinion, 2/6/15/ at 3 ("On October 8, 2014, after *reviewing the trial record* and considering the arguments and pleadings of all counsel, this court granted [A]ppellees' Motions to Bar Retrial.") (emphasis added). The trial court would not have engaged in an independent analysis if it had believed that this Court's prior decision required it to bar retrial.

The Commonwealth also draws our attention to the following statement from the trial court opinion:

> The Superior Court ultimately went on to find that the prosecutorial misconduct "was highly prejudicial" to the defendants and "when considered in the context of the atmosphere of the trial as a whole, constituted *deliberate attempts to destroy the objectivity of the jury and prevent the jury from rendering a true verdict.*" Superior Court Opinion, p. 29. (emphasis added). This finding as to the prosecutor's motive and intent – twice repeated in the Opinion at pp. 9 and 29 – clearly brings this case within the **Smith**-**Martorano** double jeopardy boundaries and distinguishes it from those cases in which even intentional prosecutorial misconduct was not deemed sufficiently egregious to bar a retrial.

Trial Court Opinion, 2/6/15, at 18.

Here, the trial court merely sets forth the earlier findings of this Court that the Commonwealth engaged in acts that prejudiced Appellees. It was the trial court alone that reached the independent conclusion that these acts met the requirements for dismissal under **Smith** and **Martorano**.

- 20 -

This position is supported by the following exchange between the prosecutor and the court at the hearing on the motions to bar retrial:

> Commonwealth: I am saying that the claim, as I understand it here, is that everything that's in the Superior Court decision somehow mirrors Jay Smith and that the Court is bound by that –
>
> The Court:    No, it doesn't.
>
> Commonwealth: -- and that somehow that is what is barring retrial.
>
> The Court:    I am not saying it bars retrial. What I am saying is, the opinion conclusively finds, makes a finding about what the Commonwealth's attorney was doing in this case when he engaged in the misconduct which the Superior Court said was sufficient to grant a new trial. Of course, the Superior Court wasn't commenting in its opinion on the issue of retrial that wasn't before them. The double jeopardy motion wouldn't be filed until the case came back here and the Commonwealth was seeking to retry the defendants.

N.T. Oral Argument, 10/9/14, at 11-12.

Based on our review of the record, we conclude that the trial court independently decided the double jeopardy issue. Accordingly, the Commonwealth is not entitled to relief on this issue.

The Commonwealth next argues that the trial court erred by not transferring this matter to the judge who presided over Appellees' trial. In **Commonwealth v. Buffington**, 44 A.2d 1194 (Pa. Super. 1982), this Court noted that when determining the motives of the prosecutor, the trial judge is in a better position to decide the question than a court examining a dry record. **See also Commonwealth v. Wright**, 255 A.2d 651 (Pa. 1970).

- 21 -

However, there are significant procedural differences between *Buffington*, *Wright* and the instant matter.

In *Buffington* and *Wright*, the trial court granted the defendants' motions for mistrial. Then, prior to appellate review, the same court denied the motions to bar retrial based on double jeopardy. In neither case had there been an intervening appellate decision holding that the Commonwealth's actions "constituted deliberate attempts to destroy the objectivity of the jury and prevent the jury from rendering a true verdict." *Commonwealth v. Brown, J. et al*, *supra* at 9. Moreover, both *Wright* and *Buffington* provide that a transfer is not necessary when the prosecutor's intent is clear from the record. Here, Judge Lerner found that the prosecutor intentionally had undertaken to prejudice the defendant to the point of the denial of a fair trial. *See Smith*, *supra*.

Furthermore, Local Rule 605 of the Criminal Division of the Court of Common Pleas of Philadelphia County provides in relevant part, "All Pretrial Motions applicable to cases in the . . . Homicide Program will be scheduled by the applicable Calendar Judge and heard by the Motions Court Judge assigned to that Program." Phila. Co. Crim. Div. Rule 605. Because Judge Lerner was the assigned Judge, transferring the matter to the judge who presided over the trial would have been a violation of Local Rule 605.

Accordingly, there is no merit to the Commonwealth's position that Judge Lerner erred by not transferring the matter to Judge Woods-Skipper.

In its final issue, the Commonwealth seeks to relitigate whether the prosecutor committed misconduct.

This Court already decided the issue on direct appeal from the judgments of sentence. The Commonwealth then sought reargument in this Court and allowance of appeal in our Supreme Court, both of which were denied.

> The law of the case doctrine provides, in pertinent part, that "upon a second appeal, an appellate court may not alter the resolution of a legal question previously decided by the same appellate court. . . ." *Commonwealth v. Starr*, 664 A.2d 1236, 1331 (Pa. 1995). We may not depart from the law of the case doctrine unless confronted with exceptional circumstances, such as "where the prior holding was clearly erroneous and would create a manifest injustice if followed." *Id.* at 1332.

*Commonwealth v. Yarris*, 731 A.2d 581, 586 (Pa. 1999). In light of the thorough analysis of the prior panel of this Court with respect to prosecutorial misconduct, *see Brown*, *J.*, *supra*; *Commonwealth v. Brown, R.*, *supra*, the Commonwealth has failed to establish that it is entitled to the exceptional remedy of a departure from the law of the case doctrine.

For all of these reasons, we conclude that the trial court did not err when it concluded that double jeopardy bars the retrial of Appellees.

Orders affirmed.

OTT, J., joins the memorandum.

STEVENS, P.J.E., files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/6/2016